Filed 7/29/26  P. v. Evans CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>         v.<br><br>MINDIE EMILIE EVANS,<br><br>    Defendant and Appellant. | F086691<br><br>(Super. Ct. No. BF180263C)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant was convicted of murder and conspiracy to commit murder on the theory that she instigated the killing of Dontae Lee by codefendant Louis Bell. She raises several challenges to her convictions, which we reject. Accordingly, we affirm the judgment.

## STATEMENT OF THE CASE

In an information filed July 16, 2021, the Kern County District Attorney charged defendant with murder (Pen. Code,[1] § 187, subd. (a), count 1) and conspiracy to commit murder (§ 182, subd. (a)(1), count 2). A consolidated information filed August 18, 2021, again charged defendant with murder (§ 187, subd. (a), count 2) and conspiracy to commit murder (§ 182, subd. (a)(1), count 3). The consolidated information also charged codefendants Louis Bell and Dellon Bell with deliberate and premeditated murder. The consolidated information further alleged the murder was committed by means listed in section 189.

The information was subsequently amended to add aggravating circumstance allegations under the following provisions to both counts 2 and 3: California Rules of Court, rule 4.421(a)(1), (a)(3), (a)(8), and (b)(1). Defendant waived her right to a jury trial on the aggravating circumstance allegations.

A jury convicted defendant of murder and conspiracy. The court subsequently found all of the aggravating circumstance allegations true.

The court sentenced defendant to 25 years to life on count 2, plus a stayed (§ 654) term of 25 years to life on count 3.

## FACTS

### *Discovery of Dontae Lee's Body*

On January 4, 2020, at around 1:26 a.m., an officer was dispatched to 904 30th Street on reports of an unresponsive male laying in an alley. Officers were initially

---

[1] All further statutory references are to the Penal Code unless noted otherwise.

2.

unable to locate the person. At approximately 1:39 a.m., fire department personnel contacted the police department to report they had found the man about one city block away. The man, identified as Dontae Lee, had been stabbed eight times. According to the forensic pathologist who performed Lee's autopsy, five or six out of the eight stab wounds could have been independently fatal. Based on the wounds, the knife used would have been capable of "going at least four inches, maybe five inches." Lee's hands and face were swabbed for DNA.

*Police Investigation*

Officer Chad Garrett was the lead investigator for the case. Based on prior interactions, Garrett knew Lee was "a fixture" at a nearby Fastrip gas station. The Fastrip is about one to one and a half minutes away by car from where Lee's body was found. Video surveillance from the Fastrip showed Lee at around 9:00 a.m. on January 3, wearing the same clothes as when he was found dead.

A black Samsung Note 8 cell phone was located about 20 feet away from Lee's body. The screen illuminated and said, "Boss Ray Ray's Note 8." The phone had several "selfie" photographs of the same individual, which law enforcement believed could be the phone's owner. DMV photographs of Louis showed that he was the person depicted in the "selfie" photographs on the cell phone found at the scene. Using the coordinates from the photographs' geolocation data, law enforcement obtained a specific address in Bakersfield about two miles from the crime scene. There were several names associated with the address, including Louis and Dellon Bell.

Louis was brought to the police station on January 9. Louis had two cell phones on his person, a Samsung Note 9 and a Samsung Note 10. The screen of the Samsung Note 9 said, "Boss Ray Ray's Note 9." The screen of the Samsung Note 10 said, "Boss Ray Ray's Note 10." Louis also had a large, fixed-blade knife attached to his belt in a black sheath. The handle and blade of the knife were swabbed by an employee of the

3.

Bakersfield Police Department Crime Scene Unit. Louis also had tattoos on his arms, one contained the text, "Boss," and another contained the text, "Ray Ray." Another tattoo read, "Mindie," which law enforcement believed referred to defendant.

Officers also contacted Dellon and defendant that day. Dellon had a laceration on his hand. Defendant had a Samsung Note 4, which contained text messages from one of Louis's numbers. However, there were no responses from defendant's number, leading law enforcement to believe her responses had been deleted (or that she had failed to respond).

Law enforcement interviewed Louis on January 9. He said he had two Note 8 phones, but had sold them one or two years ago.[2] When shown the text message indicating he had lost his Note 8, Louis claimed he had meant to say he had lost his flip phone, not his Note 8.

Louis claimed he went to bed "probably about" 8:30. Louis said he would ride by the Fastrip but he never stops there. He said the last time he had been in the area of the Fastrip was "probably a month ago." However, police later reviewed surveillance video from the Fastrip showing Louis and Dellon arriving at the Fastrip at around 8:33 p.m. on the night of the stabbing.

Police also interviewed Dellon Bell. Dellon said that on the Friday in question, he went to church a little after 7:00 p.m. Dellon biked home, but stopped for a drink on his way. He also stopped at Jefferson Park to "rest" for 20 minutes. He arrived home at around 11:00 or 11:15.

When shown a picture of the victim, Dellon said, "they call him 2000."

*Timeline of Text Messages and Surveillance Footage*

---

**2**    The parties cite to the transcript of various interviews in the clerk's transcript and we will do the same.

On the morning of January 1, a few days before Lee's death, defendant texted Louis saying, "Great flashbacks like hell. Just like when that fat m.f. who beat me and tried to rape me in the alley. You know who. The one you said you're going to stick tonight."

Later in the evening of January 1, defendant texted Louis, "Thought you were going out tonight." She then said, "You know to handle that." Louis replied, "Friday."

On Friday, January 3, at 8:07 p.m., defendant sent a text message to Louis, saying, "I need you daddy. Be safe about it." At 8:09 p.m., on January 3 defendant sent a text message to Louis saying, "Daddy be clean about it cus that m.f. need it for touching your baby girl."

At 8:31 p.m., Louis's phone was connected to a cell tower that covered the Fastrip and the crime scene, but did not provide coverage to defendant's residence. Surveillance video showed defendant and Dellon arriving on bicycles to the Fastrip at around 8:33 p.m. Louis texted defendant, "at F.S."

At 8:46 p.m., Louis texted defendant saying, "posted now waiting." The location data from Louis's phone continued to indicate it was near the Fastrip. At 8:47 p.m., defendant sent a text message to Louis saying, "Do that M.F the way he did me." At 8:48 p.m., Louis and Dellon's bikes are still visible on the Fastrip surveillance video.

At 8:53 p.m., Louis received a text message from defendant saying, "thank you Daddy." The location data indicated Louis's phone was still in the area of the Fastrip at this time.

At 9:08 p.m., Louis's phone sent a text message to defendant saying, "about to do it now."[3] Location data showed Louis's phone moving closer to the crime scene at around 9:50 p.m. At 9:59 p.m., Louis texted, "done." Defendant texted, "Go daddy go.

---

[3]    A screenshot of the text messages admitted as Exhibit 66 shows the exact wording was, "Bout 2 do it now."

5.

[¶] Text me when you get home."  Shortly after 10:00 p.m., location data showed Louis's phone moving away from the crime scene area in the direction of his residence.

At 10:14 p.m. or 10:23 p.m., Louis texted defendant, "[L]ost my NOTE 8."  At the time of the message, Louis's phone was connecting to the cell tower that provides coverage to the crime scene and the Fastrip.  Phone location data ending at 10:34 p.m. showed the phone again moving away from the crime scene area toward the direction of Louis's residence.  Defendant told Louis to have his "brother look for it," presumably referring to the lost phone.  She later texted, "Be careful if going back."

Surveillance footage showed Louis and Dellon at a store about two blocks from their residence at around 11:00 p.m.  At 11:09 p.m., defendant sent a text message to Louis saying, "Daddy don't throw no clothes away, burn them, in the grill, no joke."  At 11:28 p.m., Louis sent a text message to defendant saying, "I'm at the crib now."  At 11:33 p.m., defendant texted Louis saying, "Probably won't find out tell [*sic*] morning. they think he sleep probably."  A few minutes later, defendant texted Louis, "Humm  [¶] Who do you think will find him first."  At 11:44 p.m., Louis texted, "hungry after killing."

Louis texted defendant at 11:50 p.m., saying, "Keep lis."  Defendant sent a message at 11:51 p.m. saying, "Well he deserved it he hurt your baby girl."

Defendant sent a message to Louis the next morning at 8:31 a.m. saying, "Man found stabbed.  They found this man at 1:30 a.m. on 30th Street near f.s."  Louis responded with several emojis, including a thumbs up emoji.

At 9:03 a.m. that morning, Louis sent a message to his other brother, Victor Bell, saying, "All right 2000 gone cuz thanks to me'" with a thumbs up emoji and a face emoji.

At 10:16 a.m., Louis messaged defendant saying, "I lost the Note 8 last night."  Defendant asked where he had lost it and Louis said, "By Glenner."[4]  Defendant told

---

[4]     There is a business about one block from the crime scene called "Gleaners."

6.

Louis to look for the phone with his brother. Louis responded that he would send his brother.

At 10:49 a.m., defendant asked Louis who was texting her from another number. Eventually, defendant said the message the other number sent her was: "Is the same alley where you did that I'm trying to stay away from there a while they may be after me now."[5] Defendant texted, "So that's your bro texting me then," to which Louis initially responded, "No." Louis told defendant he would not worry about it. Defendant said, "So who's that texting me." Louis said, "Could be any body." Defendant said, "Well they know about it." Louis responded, "No worries," then asked what the person had said to defendant. Louis said, "Must found phone or something." Defendant said the number was "6613140462" and repeated that the number had texted her about the alley and expressed concern "they may be after me now." Louis later texted, "It may be my big bro." He then said, "No that was my lil bro he is the only person who goes there so u good he thinks I still have that #" and said, "U good." Louis then said, "Nobody knows it was me." Defendant responded, "Well he shouldn't know." Louis told her to block the number for now.

At 12:02 p.m., Louis texted defendant, "My adrenaline is still going." At 1:16 p.m., Louis said he was looking for his Note 8. Defendant responded that she hoped he found it. Louis responded, "Nope heading back 2 the crib now."

At 2:19 p.m., Louis said, "So I need 2 know is he gone 4 real D." Defendant responded in several messages, including one that said, "And yes he's gone for real. They are calling it a suspicious death."

At 4:10 p.m., Louis said, "I still have the B.kN.i. took a pic of it I have not cl. it yet." Louis sent a picture of a knife with a red substance that appeared to be blood. The

---

[5]     Exhibit 105 showed the exact text message was, "Is the same ally wear u did that I'm trying stay away from their [sic] a while they may be after me now."

7.

metadata of the photograph indicated it was taken on January 4 at 8:21 a.m. at defendant's residential address.

On January 10, the day after Dellon was initially interviewed, he sent a message saying, "Had to get rid of my phone. Something bad happened."

### Execution of Search Warrant

On January 10, law enforcement executed a search warrant at the apartment complex located at 1023 Water Street. Louis had said he lived in unit 2, Dellon said he lived in unit 7, and their mother lived in unit 6. In unit 6, officers located a sweatshirt and a pair of pants in a bucket of bleach. The sweatshirt looked like one visible in the Fastrip surveillance video. Officers also located knife inside a pile of male clothes in a closet. The knife was swabbed.

A bicycle was located in the front living room of unit 7. Police removed a silver knife in a black sheath from the bicycle.[6]

### DNA Testing

Subsequent testing of a swab from the plastic lining of a knife sheath could not exclude Louis or Lee as the contributor. A criminalist testified that "a likelihood ratio was calculated using the TrueAllele Casework System, and a match between this evidence item and Dontae Lee is X times more likely than a coincidental match to a random, unrelated person from the following population groups: … 1.8 trillion for African-American, 20 trillion for Caucasian, and 100 trillion for Hispanic."

### Arrests

Louis and Dellon were arrested on March 3, 2021. Dellon had two pocket knives and Louis had two sheathed knives.

---

[6]    Surveillance video showed defendant with a silver fixed-blade knife and a black sheath on the night of the stabbing.

Garrett interrogated Louis. Garrett confronted Louis with footage from the Fastrip, and Louis admitted he was depicted. Garrett noted Louis had previously said he was not in the area of the Fastrip. Louis claimed he had previously admitted to getting a beer at the Fastrip. In fact, Louis had repeatedly denied being in the area of the Fastrip during his prior police interview.

Louis said he had been standing outside the Fastrip drinking a beer with Dellon. Louis said he saw "2000" passing by but was only able to talk to him from a distance. Louis also claimed he saw two people scuffling and left. He initially denied coming back to the area to search for his phone. Garrett told defendant he had phone records showing he came back. Defendant then claimed he did come back, but just not to the area where people had been fighting.

Louis also tried to explain away his text messages with defendant. For example, he said "hungry after killing" simply meant he was "ready to eat again." Detective Garrett told Louis he texted defendant at 10:35 p.m., saying "Done, say nothing, you owe me." Louis responded that defendant simply owed him some money.

Louis continued to deny killing Lee throughout the interrogation.

Law enforcement also interviewed Dellon. Garrett reminded Dellon he had previously claimed he had not been near the Fastrip for a week. Dellon admitted he had indeed been at the Fastrip for an hour or so to get a drink. Dellon later said he had not been completely honest in his first interview because he was scared and nervous of being falsely accused. However, Dellon continued to deny any involvement in Lee's death. At one point, Dellon said, "I wasn't in that alley when my br-, when they did that, or whatever happened. I was not in the alley. I wasn't there. I was ridin' around close. Yes, I was. Because I was tryin' to find out where everybody at. I was ridin' around close, yeah, I'm not gonna deny that."

Dellon said he did not talk with defendant and that she "acts like she's scared of me." Dellon denied switching knives with Louis.

9.

*Defendant's Letters to Louis*

Defendant wrote letters to Louis while he was in custody. One letter began, "Daddy, here is what I know about the case. [¶] Note 10 Plus never factory reset. [¶] All text[s] were in the phone." Later defendant said she wished "D would admit his wrongdoing!!!"

In one of the letters, defendant said she spoke to defense counsel and a personal investigator who told her she "could get up to 5 to 6 years for purglary [*sic*]."

*Interview of Defendant*

Defendant was interrogated on May 25, 2021, after her arrest. Detective Garrett showed her photographs of Dontae Lee, and defendant claimed she did not know him. Defendant denied that Lee had "grabbed up on" her or had done anything inappropriate with her.

Garrett confronted her with a text message she sent on January 1, 2020, stating, "Great flashbacks like hell, just like when that fat motherfucker who beat me and tried to rape me in the alley. You know." Defendant initially claimed she did not remember the text message. Later she claimed, "that was like 2017." She said she had been raped in Mississippi but not "here."

Garrett then confronted her with the last part of the message, which read, "You know, the one you said you're going to stick tonight." Garrett also brought up messages that said, "You know how to handle that," and "I thought you were going to go out tonight." Defendant replied to Garrett by saying that "it's been too long" and she was "heavily medicated." Garrett mentioned the text message that said, "Do that mother fucker the way he did me. Thank you, daddy." Defendant responded, "I don't know" and said that she had two phones working at the same time.

Defendant claimed she told Louis to burn his clothes because of COVID.

*Defendant's Trial Testimony*

Defendant testified at trial that she considered Louis her husband of 24 years. They met when defendant was 17 years old. Defendant was physically abused by Louis's older brother Victor. Victor also required her to "perform things on him" that she had "never done before." She was also "prostituted out every day" for three and a half years.

Defendant has a tattoo that says, "property of Ray Ray," which was Louis's idea.

In December 2016, Louis killed defendant's puppy and threatened her. Louis and defendant also "became physical" with each other and defendant called the police.[7] Defendant was willing to deal with abuse in order to have food and a house.

Around December 2019, Louis began accusing defendant of infidelity. A rumor had begun circulating that defendant "slept with somebody" or that someone had raped her. Defendant denied any infidelity. Defendant and Louis got into a fight, so defendant went to a shelter on December 27, 2019. Louis had given defendant a Note 4 phone, which she used to communicate with him while at the shelter. Later, she acquired another phone, an "LG K40." Defendant communicated with Louis through both phones.

Defendant claimed her text message about "sticking the M.F. who tried to rape [her]" was merely an attempt to keep Louis from being mad at her. Louis kept accusing her, so defendant figured she would give in and claim "whatever was said is true, fine, whatever." Specifically, defendant explained the text message in her testimony as follows: "Trying to keep him from being angry with me, trying to side with him so he wouldn't — so — I don't know how to explain it. It's just he kept accusing me of something. So I just finally gave in and said here, finally, whatever was said is true, fine, whatever, whatever you do, whatever happens, I'm — I can't take it anymore."

---

[7]  An officer testified that he investigated possible domestic violence at "3706 M. Street, Apartment 3" on December 12, 2016. The officer made contact with defendant, who had an abrasion on her forehead. The officer transported defendant to a battered women's shelter.

However, defendant had in fact not been raped.

Defendant claimed that when she was interviewed by law enforcement in May 2021 she was scared to implicate others.  She also claimed that the letters she wrote to defendant were meant to show she was "for him."

Defendant denied knowing Donte Lee.  Defendant claimed she never wanted anyone to be hurt or killed.  She denied planning with Louis to kill Lee.

## DISCUSSION

I.    SUBSTANTIAL EVIDENCE SUPPORTED DEFENDANT'S MURDER CONVICTION

Defendant raises a substantial evidence challenge to her murder conviction.

*A.    Additional Background*

The prosecutor made the following argument to the jury in closing:

> "Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime.  Mindie didn't only intend that Louis and Dellon commit this crime, she started and fabricated the entire situation.  The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.  She told Louis this would happen in the alley.  She told Louis when it would happen.  They discussed the fine details when and where it would occur.

> "Someone aids and abets a crime if she knows of the perpetrator's unlawful purpose and she specifically intends to and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime.

> "Mindie falls into every single one of these categories, ladies and gentlemen.  'Go daddy go.'  Nothing more encouraging than that.  'I thought you was going out tonight to handle that.  Do that MF the way he did me.  You know, the guy you are going to go stick in the alley tonight.'

> "And it specifically tells you if the elements for aider and abettor, if she aided, instigated, promoted, encouraged, if she did all of the things you have seen her to have done in this case, it doesn't matter where she was.  It is just like the puppet master in Ocean's 8.  The person pulling the strings does not have to be the person stabbing the knife or shooting the gun.

12.

"You do not get to start a murder, facilitate, instigate, promote, and encourage that person to commit the murder and then sit on the stand and say, shooo, I was in Fresno. That is not how it works, and that is not how the law works."

Later, the prosecutor argued that defendant was guilty "because she planned it."

*B.     Law*

A person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Thus, one way aiding and abetting can be proven is by showing the defendant knew the perpetrator's unlawful purpose and specifically intended to — and does in fact — instigate the perpetrator's commission of that crime. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 333–334, disapproved on other grounds in *People v. Clark* (2024) 15 Cal.5th 743, 764, fn. 8.) Applied here, defendant would be guilty of aiding and abetting murder if she knew Louis's unlawful purpose, intended to instigate the murder of Lee, and, through her advice, actually instigated said murder.

" 'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." ' " (*People v. Renteria* (2022) 13 Cal.5th 951, 970.)

C. *Analysis*

Here, there was substantial evidence defendant knew Louis's purpose of killing Lee and specifically intended to and did instigate Louis's killing of Lee. Specifically, defendant sent Louis a text message a few days before Lee's killing, saying, "Just like when that fat m.f. who beat me and tried to rape me in the alley. You know who. The one you said you're going to stick tonight." On the night of the killing, defendant sent a text message to Louis saying, "Do that M.F the way he did me." At 8:53 p.m. — which was likely within an hour or two of the killing — defendant sent a text message from defendant saying, "thank you Daddy." Location data showed Louis's phone moving closer to the crime scene at around 9:50 p.m. and nine minutes later, Louis texted, "done." Defendant responded, "Go daddy go. [¶] Text me when you get home." Louis later texted defendant that he was "done" and that she "owe[d]" him.

These text messages raise an inference not only that defendant *knew* Louis would stab Lee, but that she *instigated* the stabbing. Specifically, there is a reasonable inference that saying, "Do that M.F. the way he did me" was an express request that defendant stab Lee.

Defendant observes that the dictionary definitions of "stick" range from stabbing to defrauding. However, the fact that Louis ultimately stabbed a man a few days later and defendant said the stabbing victim "deserved it" for hurting her, raises a strong inference that the original reference to "stick," meant stab and not defraud or some other meaning. We indulge that inference since it is favorable to the judgment.

Moreover, there is a reasonable inference that defendant was thanking Louis for stabbing Lee ("thank you Daddy"), was cheering him on immediately after the killing ("Go daddy go"), and that Louis believed defendant was now indebted to him ("you owe me"), which all further supports the conclusion the stabbing was done at defendant's request. Defendant dismisses the "Go daddy go" message because it was sent after the killing and therefore could not constitute encouragement to commit murder. It is true that

14.

defendant's intent after the killing is not the ultimate issue, but rather her intent in instigating the murder (which necessarily would have occurred before the murder.) But that does not mean that words or conduct after the killing are irrelevant. Quite the contrary, later statements can explain the meaning of prior messages. The inference that defendant immediately cheered on the stabbing of Lee, and that Louis felt defendant was now indebted to him is relevant to whether the pre-killing messages indicate the stabbing was done at her behest.

Defendant claims the evidence only establishes that she knew Louis would *attack* Lee, not that Louis intended to *kill* Lee. But mere hours after the "attack," Louis told defendant he was hungry after *killing*. Defendant sent a message some seven minutes later saying, "Well he deserved it he hurt your baby girl." Defendant responded to knowledge Lee had been killed not with surprise or condemnation, but with support. While these messages were sent after the stabbing, they support an inference that defendant's *pre-murder* request for Louis to "stick" Lee and "do him" were indeed requests to kill — rather than merely attack — Lee.

Defendant contends that while a stabbing *can* be lethal, it can also be nonlethal. But the fact that not every stabbing is lethal does not mean encouraging someone to stab another cannot raise an inference of intent to kill. By analogy, not all gunshots are fatal, but encouraging someone to shoot another can certainly raise an inference of intent to kill. Taking it further, not all gunshots to the head are fatal, yet encouraging someone to shoot someone in the head undoubtedly raises an inference of intent to kill. Moreover, we need not rely on the isolated reference to stabbing, given the context provided by the other messages discussed above.

Defendant also contends the messages do not show she "planned" the attack, as the prosecutor mentioned in closing argument. But "planning" is not the only way to aid and abet a murder — "instigating" also suffices. Here, there was substantial evidence of

15.

defendant instigating the murder. Consequently, whether or not there was sufficient evidence defendant "planned" the murder is immaterial.

In sum, the text messages before and after the killing, taken as a whole, support an inference defendant requested and instigated Louis's *killing* of Lee.

## II. SUBSTANTIAL EVIDENCE SUPPORTED DEFENDANT'S CONSPIRACY CONVICTION

Defendant next contends there was insufficient evidence to support her conspiracy conviction.

### A. Additional Background

"Conspiracy to commit murder. This is between Mindie and Louis. Dellon is part of what you heard from the judge of the uncharged conspiracy, where we know he was part of this conspiracy because he was part of the actual crime.

"But what do you have to find to convict Mindie of conspiracy to commit murder? Mindie intended to agree and did agree with Louis to commit the murder of Dontae Lee.

"Again, you have the text messages. 'You know, that guy you are going to go stick in the alley, the one that tried to beat me and rape me. Do that MFer the way he did me. He deserved it. He hurt your baby girl.'

"Those are all agreements to kill Dontae Lee. Mindie starts the agreement, and Louis says, 'okay. On Friday.' 'You are going to go do that tonight.' 'Posted. Now waiting.' 'Done.'

"We haven't even gotten to the real good text messages yet, ladies and gentlemen. 'Hungry after killing.' 'This ain't like some puppies.' 'This can get in big trouble.' 'Done. You owe me.' Those are also all text messages you have in evidence that show you the conspiracy, the agreement that took place between the parties.

"Element two. At the time of the agreement, Mindie and Louis intended that Louis would commit the murder of Dontae Lee. Again, established by People's 105. Louis and Dellon committed the stabbing of Dontae Lee to follow through with the murder of Dontae Lee. That was the completion of the conspiracy.

16.

> "Louis and Mindie agreed that on January 3rd, Friday, 2020, Dontae Lee will be stabbed to death.
>
> "January 3rd, 2020, about 8:00 p.m., Dellon and Louis Bell leave their home armed with knives and carry out the conspiracy by stabbing Dontae Lee to death in the alley.
>
> "At least one of the overt acts was committed in California. You will see that the overt acts are the text messages.
>
> "The asking by Mindie to Louis to commit this murder. You heard the evidence. The messages were sent from Fresno. They were received in Bakersfield, both places within California."

Later, the prosecutor cited Louis's message saying, "done, saying nothing, you owe me," and argued it meant: "You owe me because I just killed this man you asked me to kill. You owe me because I just completed the conspiracy we formed."

The prosecutor also argued, " 'You know, to handle that.' He responds, 'on Friday.' Get to Friday, 'bout to go do that now if you know what I mean.' 'Yes. Please do.' 'Be safe.' [¶] Now, for this, we go further than encouraging, helping, promoting. She is asking him. 'I'm about to go stick that guy in the alley.' 'Yes, please do. I need you, daddy; so be safe about it.'"

*B.    Law*

Section 182 criminalizes two or more people conspiring to commit a crime. (§ 182, subd. (a)(1).) " 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.) The "overt act" must be something other than the agreement itself. (§ 184.) The overt act must be alleged in the indictment or information. (§ 182, subd. (b).) Here, the overt act alleged in the information was defendant "asking Louis Bell to commit the murder."

" '[E]vidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 562.)

C.      *Analysis*

Defendant first contends, as she did the previous argument, that there was insufficient evidence she intended for Louis to *kill* Lee. However, as detailed above, there was plenty of evidence to support an inference defendant and Louis "tacitly came to a mutual understanding" to kill Lee. Specifically, the text messages between defendant and Louis support an inference that defendant instigated Louis killing Lee in retaliation for him raping her.

On the morning of January 1, a few days before Lee's death, defendant texted Louis saying, "Great flashbacks like hell. Just like when that fat m.f. who beat me and tried to rape me in the alley. You know who. The one you said you're going to stick tonight." Defendant argues that merely instigating murder cannot support a conspiracy conviction because the overt act must occur *after* the agreement to commit the murder. However, recall that juries are permitted to *infer* the existence of a conspiracy from the conduct, relationship, interests, and activities of defendant and Louis. (*People v. Clark, supra,* 63 Cal.4th at p. 562.) From this text message's past-tense reference to what Louis "said" (along with the others that give it context), the jury could have reasonably inferred defendant and Louis had *previously* agreed that Lee would be stabbed *before* this text message was sent. Under that inference — which we accept because it is favorable to the judgment — the text messages at issue would have been sent after the agreement to commit murder was made.

18.

Defendant also argues that there were no text messages wherein she asked Louis to commit murder. But the prosecutor argued otherwise, pointing specifically to the text message where defendant said, "Yes. Please do," in response to Louis saying he was "bout to go do that now if you know what I mean." Saying "please do," in response to a proposed or anticipated action *does* constitute asking someone to do the action. Here, there is a reasonable inference that by saying "please do," defendant was asking Louis to proceed with their agreement to kill Lee.

III.    DEFENDANT FORFEITED HER CLAIM OF INSTRUCTIONAL ERROR BY FAILING TO RAISE IT BELOW

Defendant contends the court gave several incorrect and/or confusing instructions to the jury.

### A.    *Additional Background*

The court held an in-chambers conference regarding jury instructions. The court had sent counsel two rounds of proposed instructions. The court and all counsel then went through each instruction one-by-one. The court made a record that they had previously discussed the uncharged conspiracy instruction.

The court then asked defendant's counsel whether there were any instructions she objected to. Counsel objected only to CALCRIM Nos. 361 and 362, and specifically said she was not requesting any additional instructions.

### B.    *Contentions*

On appeal, defendant contends (1) the court's modified version of CALCRIM No. 416 was erroneous and confusing, and conflicted with CALCRIM No. 563; (2) the court's modified version of CALCRIM No. 418 misstated the law as to defendant and pointed the jury to an incorrect definition of conspiracy; and (3) CALCRIM No. 563 erroneously directed the jury to a murder instruction. Defendant made no objection to these instructions even when expressly asked by the court. The Attorney General contends defendant forfeited the claims of instructional error by failing to object below.

19.

*C.    Analysis*

Failure to raise an alleged instructional error in the trial court forfeits the argument for appeal.  (See *People v. Bolin* (1998) 18 Cal.4th 297, 326.)  Appellate courts "may" (§ 1259) choose to consider such arguments even in the absence of such an objection.  (See *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 902, fn. 12 [appellate court retains discretion to consider instructional error claim that was not raised below].)  We decline to do so here.[8]

**DISPOSITION**

The judgment is affirmed.


                                                                            FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

---

[8]    Defendant argues that the doctrine of invited error does not apply.  We do not rely on the doctrine of invited error, which is distinct from forfeiture.  (See *People v. Midell* (2025) 113 Cal.App.5th 1060, 1072, fn. 7.)